AO 243 (Rev. 09/17)

**MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT**

**SENTENCE BY A PERSON IN FEDERAL CUSTODY**

FILED

NOV 0 6 2025

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ___ DEPUTY

| United States District Court | District | Southern District of California | Docket or Case No.: 3:22-cr-00778-LL |
|---|---|---|---|
| Name *(under which you were convicted)*: Christopher Baltezar Hernandez | | | |
| Place of Confinement: USP Hazelton | | Prisoner No.: 69593-112 | |
| UNITED STATES OF AMERICA | | Movant *(include name under which convicted)* | |
| V. | | CHRISTOPHER BALTEZAR HERNANDEZ | |

### MOTION

1. (a) Name and location of court which entered the judgment of conviction you are challenging:

   United States District Court for the Southern District of California

   (b) Criminal docket or case number (if you know): 3:22-cr-00778-LL

2. (a) Date of the judgment of conviction (if you know): 10/22/2024

   (b) Date of sentencing: 10/22/2024

3. Length of sentence: Life in prison.

4. Nature of crime (all counts):

   Count 1s: Conspiracy to Murder a United States National in a Foreign Country (18 U.S.C. § 1117).
   Counts 2s-6s: Stalking Resulting in Death and Aiding and Abetting (18 U.S.C. §§ 2261A(1)(A), 2261(b)(1), and 2).

5. (a) What was your plea? (Check one)

   (1) Not guilty ☐          (2) Guilty ☑          (3) Nolo contendere (no contest) ☐

6. (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to?

   Not Applicable.

6. If you went to trial, what kind of trial did you have? (Check one)    Jury ☐    Judge only ☐

7. Did you testify at a pretrial hearing, trial, or post-trial hearing?    Yes ☐    No ☑

AO 243 (Rev. 09/17)

8.  Did you appeal from the judgment of conviction?    Yes ☐    No ☑

9.  If you did appeal, answer the following:

    (a)  Name of court: _____

    (b)  Docket or case number (if you know): _____

    (c)  Result: _____

    (d)  Date of result (if you know): _____

    (e)  Citation to the case (if you know): _____

    (f)  Grounds raised:




    (g)  Did you file a petition for certiorari in the United States Supreme Court?    Yes ☐    No ☐

        If "Yes," answer the following:

        (1) Docket or case number (if you know): _____

        (2) Result: _____

        (3) Date of result (if you know): _____

        (4) Citation to the case (if you know): _____

        (5) Grounds raised:




10.  Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications, concerning this judgment of conviction in any court?

    Yes ☐    No ☑

11.  If your answer to Question 10 was "Yes," give the following information:

    (a)  (1) Name of court: _____

        (2) Docket or case number (if you know): _____

        (3) Date of filing (if you know): _____

AO 243 (Rev. 09/17)

(4)  Nature of the proceeding: _____

(5)  Grounds raised:

(6)  Did you receive a hearing where evidence was given on your motion, petition, or application?

Yes ☐        No ☐

(7)  Result: _____

(8)  Date of result (if you know): _____

(b)  If you filed any second motion, petition, or application, give the same information:

(1)  Name of court: _____

(2)  Docket of case number (if you know): _____

(3)  Date of filing (if you know): _____

(4)  Nature of the proceeding: _____

(5)  Grounds raised:

(6)  Did you receive a hearing where evidence was given on your motion, petition, or application?

Yes ☐        No ☐

(7)  Result: _____

(8)  Date of result (if you know): _____

(c)  Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1)  First petition:        Yes ☐        No ☐

(2)  Second petition:        Yes ☐        No ☐

(d)  If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

AO 243 (Rev. 09/17)

12.  For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground. Any legal arguments must be submitted in a separate memorandum.

**GROUND ONE:** Counsel's Representation During The Pre-Trial Phase Was Constitutionally Defective, Rendering The Decision to Plead Guilty not knowing

(a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

As will be explained in the Memorandum in Support tendered herewith counsel was ineffective during the pre-trial phase when he:

1) Failed to conduct any meaningful investigation;

2) Failed to explain the United States's high burden of proving mens rea;

3) Coerced the plea through constant threats of a "pre-determined" death penalty;

4) Misrepresented the consequences of the plea, falsely advising Henriquez that he would likely receive a 25–35-year sentence when, in fact, the plea agreement and governing law made a life sentence mandatory.

Based on this coercion and misinformation, Henriquez's plea was not knowing, voluntary, or intelligent.

(b)  **Direct Appeal of Ground One:**

(1)  If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐    No ☑

(2)  If you did not raise this issue in your direct appeal, explain why:

Henriquez's plea agreement contained an appeal waiver. Furthermore, this claim relies entirely on facts outside the trial record, including private attorney-client communications and counsel's off-the-record advice regarding the plea. Such claims are properly raised for the first time in a § 2255 motion.

(c)  **Post-Conviction Proceedings:**

(1)  Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐    No ☑

(2)  If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3)  Did you receive a hearing on your motion, petition, or application?

Yes ☐    No ☐

AO 243 (Rev. 09/17)

(4)  Did you appeal from the denial of your motion, petition, or application?

     Yes ☐     No ☐

(5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

     Yes ☐     No ☐

(6)  If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND TWO:** Counsel Was Constitutionally Ineffective During the Pre-Trial Phase for Failing to Honor Henriquez's Request to Assert His Right to a Speedy Trial

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

As will be explained in the Memorandum in Support tendered herewith counsel was ineffective during the pre-trial phase when he refused the Movant's repeated and explicit instructions, beginning in November 2022, to assert his Sixth Amendment right to a speedy trial

(b)  **Direct Appeal of Ground Two:**

(1)  If you appealed from the judgment of conviction, did you raise this issue?

     Yes ☐     No ☑

AO 243 (Rev. 09/17)

(2)  If you did not raise this issue in your direct appeal, explain why:
This claim is based on private, off-the-record communications between Henriquez and his former counsel regarding trial strategy. As such, it relies on facts outside the original court record and can only be properly developed and adjudicated through a § 2255 proceeding.

(c) **Post-Conviction Proceedings:**

(1)  Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐      No ☑

(2)  If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3)  Did you receive a hearing on your motion, petition, or application?

Yes ☐      No ☐

(4)  Did you appeal from the denial of your motion, petition, or application?

Yes ☐      No ☐

(5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐      No ☐

(6)  If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

AO 243 (Rev. 09/17)

**GROUND THREE:** Counsel Was Ineffective for Failing to Move to Withdraw the Guilty Plea After the Emergence of Overwhelming Exculpatory Evidence

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

As will be explained in the Memorandum in Support tendered herewith counsel was ineffective when he failed to file a motion to withdraw Movant's guilty plea after a wealth of powerful exculpatory evidence emerged supporting his claim of actual innocence. When Movant demanded counsel act on this evidence, counsel refused, providing the legally incorrect advice that it was "too late."

(b) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐    No ☑

(2) If you did not raise this issue in your direct appeal, explain why:

This claim is based on evidence that came to light after the guilty plea and on subsequent private communications with counsel. These facts are entirely outside the original court record and can only be adjudicated in a § 2255 proceeding.

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐    No ☑

(2) If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐    No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐    No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐    No ☐

AO 243 (Rev. 09/17)

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

___

**GROUND FOUR:**   The Conviction Was Obtained Through a Blatant Brady Violation Compounded by Counsel's Ineffective Assistance

(a)   Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

As will be explained in the Memorandum in Support tendered herewith counsel was ineffective for failing to object to the United States's suppressing favorable, exculpatory evidence. When this constitutional violation came to light, former counsel was ineffective for failing to act, wrongly advising Movant that filing a motion based on the violation "wouldnt make a diffrence."

(b)  **Direct Appeal of Ground Four:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐        No ☑

(2)   If you did not raise this issue in your direct appeal, explain why:

The underlying facts of the Brady violation and counsel's subsequent failure to act on it are outside the trial record and were not fully known until after the guilty plea. Counsel's ineffectiveness is the cause for the failure to raise this meritorious claim earlier, making it proper for review in a § 2255 motion.

(c)  **Post-Conviction Proceedings:**

(1)   Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐        No ☑

(2)   If you answer to Question (c)(1) is "Yes," state:

AO 243 (Rev. 09/17)

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(3)   Did you receive a hearing on your motion, petition, or application?
      Yes ☐      No ☐

(4)   Did you appeal from the denial of your motion, petition, or application?
      Yes ☐      No ☐

(5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?
      Yes ☐      No ☐

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

13.   Is there any ground in this motion that you have <u>not</u> previously presented in some federal court?  If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

Yes. All four grounds of ineffective assistance of counsel have not been presented before. These claims rely on information outside the original court record, such as communications with my attorney and information from the defense investigator. Such claims are properly raised for the first time in a 28 U.S.C. § 2255 motion.

AO 243 (Rev. 09/17)

14. Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the you are challenging?    Yes ☑    No ☐

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

Movant's initial pro se Motion to Vacate under § 2255, filed June 26, 2025, is pending in the U.S. District Court for the Southern District of California, Case No. 3:25-cv-01682-LL. It raises the same general issues of ineffective assistance of counsel. A motion for extension of time to file a supporting memorandum was also filed. This Amended Motion and Supplemental Memorandum will superspeed that filing.

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At the preliminary hearing:
John Owen Lanahan, Law Office of John Lanahan, P.O. Box 601400, San Diego, CA 92160-1400

(b) At the arraignment and plea:
John Owen Lanahan, Law Office of John Lanahan, P.O. Box 601400, San Diego, CA 92160-1400

(c) At the trial:
Not Applicable.

(d) At sentencing:
John Owen Lanahan, Law Office of John Lanahan, P.O. Box 601400, San Diego, CA 92160-1400

(e) On appeal:
Not Applicable.

(f) In any post-conviction proceeding:
Not Applicable.

(g) On appeal from any ruling against you in a post-conviction proceeding:
Not Applicable.

16. Were you sentenced on more than one court of an indictment, or on more than one indictment, in the same court and at the same time?    Yes ☑    No ☐

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?    Yes ☐    No ☑

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?    Yes ☐    No ☐

AO 243 (Rev. 09/17)

18.    TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

The judgment of conviction was entered on October 22, 2024. Movant did not file a direct appeal. Therefore, the conviction became final fourteen (14) days later on November 5, 2024, pursuant to Federal Rule of Appellate Procedure 4(b)(1)(A). The one-year statute of limitations for filing a motion under 28 U.S.C. § 2255(f)(1) expires on November 5, 2025. This motion is being filed before that date and is therefore timely.

---

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

A one-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of –

(1)    the date on which the judgment of conviction became final;

(2)    the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

(3)    the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4)    the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

AO 243 (Rev. 09/17)

Therefore, movant asks that the Court grant the following relief:
Vacate the conviction and sentence and remand the case for further proceedings. In the alternative, schedule an evidentiary hearing to allow Movant to prove the factual allegations contained herein.

or any other relief to which movant may be entitled.

_____
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on _____.

(month, date, year)

Executed (signed) on _____October 31, 2025_____ (date)

_____
Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| **Plaintiff / Respondent** | ) |
| | ) |
| **v.** | ) Case No:<u>**3:22-cr-00778-**</u> |
| | ) |
| **CHRISTOPHER BALTEZAR,** | ) |
| **HERNANDEZ,** | ) |
| **Defendant / Movant.** | ) |
| | ) |

**COMES NOW**, the defendant/movant, Christopher Baltezar Hernandez ("Hernandez"), *pro se*[1], and pursuant to 28 U.S.C. § 2255 ("§2255"), hereby respectfully submits this Memorandum in Support of his 28 U.S.C. § 2255 Motion ("§2255 Motion") filed contemporaneously herewith[2].

In support thereof and for the Court's consideration, Hernandez respectfully offers the following:

## I.    INTRODUCTION

The Sixth Amendment's guarantee of the effective assistance of counsel is the essential foundation of a fair and reliable criminal justice system. This constitutional right is not a privilege reserved for the popular or a courtesy for the sympathetic; it is a fundamental protection that applies with its greatest force when a defendant

---

[1] Because Hernandez is proceeding in this matter without the benefit of counsel, it is respectfully requested that a liberal interpretation be applied to her Motion and the reasonable relief requested therein. See e.g.: <u>*Erickson v. Pardus,*</u> *551 U.S. 89, 94 (2007)*.

[2] This Amended Memorandum and the corresponding Amended §2255 Motion follow the Court's order granting leave to amend.

stands accused of the most heinous offenses. It is precisely in such cases, where the facts are horrific and the stakes are highest, that our system's commitment to due process is most severely tested. Justice must not only be done but must also "satisfy the appearance of justice," a standard that loses all meaning if not rigorously applied to every individual, regardless of the gravity of the charges they face. See: _Offutt v. United States_, 348 U.S. 11, 14 (1954).

Hernandez's guilty plea, and the resulting mandatory life sentence, are the direct product of his former attorney's systemic failure to provide the effective representation the Constitution demands. Instead, counsel engaged in a campaign of coercion, using repeated threats of the death penalty and gross misrepresentations about the law—including the false assertion that the United States "didn't have to prove anything"—to pressure Hernandez into pleading guilty. This conduct rendered the plea anything but knowing, voluntary, and intelligent.

This initial failure was compounded by counsel' flat refusal to honor Hernandez's repeated, and strategically sound, requests to exercise his Sixth Amendment right to a speedy trial—a refusal that directly allowed the United States to secure the cooperation of its star witness. Most egregiously, when a wealth of powerful exculpatory evidence later surfaced—including sworn testimony and statements from three independent witnesses indicating Hernandez was not even at the crime scene—Lanahan inexplicably refused to file a motion to withdraw the tainted guilty plea, wrongly advising his client that it was "too late."

These were not isolated mistakes; they were systemic constitutional deficiencies that crippled the adversarial process at every critical stage and produced a fundamentally unreliable result: a mandatory life sentence for a man with powerful evidence of his actual innocence. For these reasons, and those set forth more fully below, Hernandez's conviction and sentence must be set aside and further proceedings held.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

In the interest of judicial economy, only the facts and procedural history relevant to the claims of error asserted in Hernandez's § 2255 Motion are discussed below.

1.    This case arises from the tragic murders of J.H., G.M.V., A.M. (age 9), A.M.M. (age 8), and S.M. (age 4) in Tijuana, Mexico.

2.    Pursuant to the district's established criminal justice act plan attorney John Lanahan ("Lanahan") was appointed to represent Henriquez. See: *DE 7*.

3.    During their first meeting in November 2022 at the GEO facility, Hernandez explicitly and persistently instructed Lanahan to exercise his Sixth Amendment right to a speedy trial. See: *Hernandez Dec. ¶ 2*. Hernandez knew that the case against him was built almost entirely on the anticipated testimony of Hernandez's co-defendant and brother, Victor Armondo Aguilar ("Aguilar"), who was not arrested until January 2023, nearly three months after Lanahan's appointment. See: *DE 23*. Henriquez, having previously and successfully invoked his speedy trial rights in a related federal case, astutely recognized that a prompt trial would force

the United States to proceed on its weak, undeveloped case before it could secure Aguilar's cooperation. See: *Hernandez Dec.* ¶ *2*.

4.    Lanahan responded to Hernandez's speedy trial demand by "arguing, trying to yell, and threatening to quit." See: *Hernandez Dec.* ¶ *3*. Lanahan's stated reasons for delay—that the case was "too big" and that he "needed time"—were for his own convenience, not for his client's benefit. See: *Id.* The delay Lanahan engineered had a direct and catastrophic consequence: it gave the United States the time it needed to apprehend Aguilar and secure his cooperation—the very outcome Hernandez had sought to avoid. See: *Hernandez Dec.* ¶ *3*.

5.    Rather than preparing for trial, Lanahan immediately began a campaign to coerce Hernandez into accepting a guilty plea. Central to this campaign was a complete failure to conduct a reasonable investigation. Hernandez's investigator, Taylor Minas ("Minas"), later informed him that Lanahan "did not review any of the discovery.....{until} well after {he} pleaded guilty." See: *Hernandez Dec.* ¶ *8 (quoting in part DE 192, at 8)*. Hernandez was only permitted to review the discovery for approximately one hour total over the course of two days before being forced to decide whether to accept a plea carrying a life sentence. See: *Hernandez Dec.* ¶ *7*.

6.    Lanahan "never explained anything" about the charges and falsely advised him that because "it was a conspiracy...the government did not have to prove anything and that the jury would find me guilty regardless." See: *Hernandez Dec.* ¶ *4*. He never explained the critical concept of *mens rea* or the high burden the United

States faced in proving Hernandez's specific intent to kill in a case lacking direct physical evidence. See: *Hernandez Dec. ¶ 12*.

7.    Armed with this self-imposed ignorance of the facts and law, Lanahan relentlessly pressured Hernandez to plead guilty through a series of material misrepresentations and threats. He coupled his legally incorrect advice with constant threats of the death penalty, telling Hernandez that "if {he} did not sign, {he} would get the death penalty, as if it was already a pre-determined thing." See: *Hernandez Dec. ¶ 4*. Most egregiously, Lanahan misrepresented the sentence itself, falsely suggesting that a plea would result in a sentence of "25-35 years," when in reality, the plea agreement and governing law made a life sentence mandatory. See: *Hernandez Dec. ¶ 5;* See also: *DE 87, at 9 n.\**. Lanahan created a high-pressure environment, telling Hernandez "you only have three days before they pull the plea and go for death." See: *Hernandez Dec. ¶ 7*.

8.    Feeling "pressured" by Lanahan and his constant death threats, and without the benefit of an informed understanding of the profound weaknesses in the United States's case, Hernandez capitulated and pleaded guilty on December 21, 2023. See: *Hernandez Dec. ¶ 9;* See also: *DE 85*.

9.    In the months following the plea, various pieces of exculpatory evidence surfaced from three independent sources. This evidence, which pointed directly to Aguilar as the sole perpetrator and affirmatively exonerated Hernandez, came to light through the following channels:

**Jay and Mike Aguilar**: Months after Hernandez pleaded guilty, the United States produced discovery containing statements from "Person

1" and "Person 2," who told FBI agents that Aguilar had bragged about committing the murders himself and never mentioned Hernandez being present. However, the United States suppressed their identities. It was not until the post-plea investigation conducted by Minas, that their identities were uncovered as Jay and Mike Aguilar— Hernandez's half-brothers and Aguilar's full brothers. Hernandez learned their true identities for the first time only weeks before his sentencing hearing. See: *Hernandez Dec. ¶ 10.*

**Luis Cardenas:** In early 2023, while incarcerated at CCA Otay Mesa with both Hernandez and Aguilar, an inmate named Luis Cardenas heard Aguilar boasting to other inmates about committing the murders. Aguilar allegedly described the specific weapon he used and his role as a "sicario" (hitman). Cardenas voluntarily approached Hernandez's legal team and provided a sworn affidavit detailing these confessions. Lanahan informed Hernandez of this affidavit after the plea was entered. See: *Hernandez Dec. ¶ 11.*

**Tanya Neil:** Hernandez learned of the most stunning piece of exculpatory evidence during the evidentiary hearing held on October 2, 2024. At that hearing, Aguilar's own mother, Tanya Neil, was called to testify by Aguilar's counsel in an attempt to benefit Aguilar. However, on cross-examination by Lanahan, she testified under oath that her son, Aguilar, had explicitly told her that Hernandez "was not there at the crime scene during the night of the murders." See: *Hernandez Dec. ¶ 10;* See also: *DE 159.*

10.  This new evidence confirmed what Hernandez had learned from his investigator after the plea: the United States's physical evidence was virtually nonexistent. There was no firearm recovered to conduct ballistic testing, shell casings were not made available for inspection, the crime scene was contaminated, and another individual's fingerprints—not Hernandez's or Aguilar's—were found on the shell casings. See: *Hernandez Dec. ¶ 12.*

11.  On December 21, 2023, Hernandez pleaded guilty pursuant to a binding plea agreement to a six-count Superseding Information. See: *DE 85; DE 87.* During the plea colloquy, Hernandez expressed confusion and disagreement with the factual

basis as read by the United States. Lanahan, assured him that any issues could be addressed and corrected at sentencing, effectively silencing his objections. See: *Declaration of Christopher Hernandez ("Hernandez Dec.") ¶ 6, attached hereto.*

12.     Armed with this new, overwhelming evidence of his actual innocence, Hernandez immediately and repeatedly implored Lanahan to file a motion to withdraw his guilty plea. See: *Hernandez Dec. ¶ 9.* Lanahan refused. He incorrectly advised Hernandez that it was "too late" and that "the judge was not going to allow it because it was too close to sentencing." *Id.* Lanahan likewise refused to file a motion asserting a violation under <u>*Brady*</u> based on the United States's grossly untimely disclosure of the statements from Jay and Mike Aguilar, dismissing this powerful constitutional claim by telling Hernandez it "would not make a difference." See: *Hernandez Dec. ¶ 11.*

13.     On October 22, 2024, this Court sentenced Hernandez to a mandatory term of life imprisonment. See: *DE 189.*

## III.     LEGAL ARGUMENT

### A.     Standard of Review

The issuance of a writ of habeas corpus has long served as the primary means for individuals to challenge unlawful detention[3]. See: <u>*Boumediene v. Bush, 553 U.S. 723, 739 (2008).*</u> For federal prisoners, this constitutionally mandated remedy is now principally embodied in § 2255, which Congress enacted as a statutory substitute for the traditional writ as part of the Judiciary Act of 1948.[3] The statute was designed to

---

[3] See: *Judiciary Act of June 25, 1948, ch. 646, 62 Stat. 967.*

address the practical difficulties that arose when prisoners filed habeas petitions in jurisdictions far from their sentencing courts, as § 2255 proceedings ensure that courts familiar with the case and record can evaluate the validity of the conviction and sentence. See: *United States v. Hayman, 342 U.S. 205, 210-19 (1952)*; See also: *United States v. Addonizio, 442 U.S. 178, 185 (1979)*. Because of the strong interest in finality that our judicial system favors, relief authorized under § 2255 is narrowly tailored. This narrow scope means that relief is reserved for extraordinary circumstances. See: *United States v. Timmreck, 441 U.S. 780, 784 (1979)*. To that end, statutorily, a federal inmate may seek relief under § 2255 on four specific grounds: 1) the sentence was imposed in violation of the United States Constitution or federal law; 2) the court lacked jurisdiction to impose such a sentence; 3) the sentence exceeded the maximum authorized by law; or 4) the sentence is otherwise subject to collateral attack. See: *28 U.S.C. § 2255(a)*. When asserting the above claims, the burden of proof rests with the defendant to demonstrate "a fundamental defect which inherently results in a complete miscarriage of justice" or "an omission inconsistent with the rudimentary demands of fair procedure." See: *Hill v. United States, 368 U.S. 424, 428 (1962)*. This burden must be met by a preponderance of evidence. See: *United States v. Johnson, 988 F.2d 941, 945 (9th Cir. 1993)*. This standard requires the defendant to persuade the Court that the facts supporting his claim are more likely true than not.

Because of this high standard, a § 2255 motion cannot be used as a substitute for direct appeal. Claims that could have been, but were not, raised on direct appeal

are considered procedurally defaulted and are barred from collateral review unless the defendant can demonstrate both cause for the default and actual prejudice resulting from the error. See: _Bousley v. United States, 523 U.S. 614, 622 (1998);_ See also: _United States v. Frady, 456 U.S. 152, 167-68 (1982)._ A court's review of a § 2255 motion is thus a step-by-step process, and a defendant's failure to clear procedural hurdles may result in the dismissal of his claims without a determination on the merits. The most significant procedural hurdle being the statute of limitations. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a strict one-year statute of limitations on § 2255 motions[4]. This period typically begins to run from the date on which the judgment of conviction becomes final. See: _Clay v. United States, 537 U.S. 522, 524-25 (2003)._ In Hernandez's case, the judgment was entered on October 22, 2024. See: _DE 189._ Because Hernandez did not file a direct appeal, his conviction became final fourteen (14) days later, on November 5, 2024. See: _Fed. R. App. P. 4(b)(1)(A)._ Accordingly, the one-year statute of limitations for filing a motion under § 2255 expires on November 5, 2025. See also: _28 U.S.C. § 2255(f)(1)._ As Hernandez's initial § 2255 motion was filed on June 26, 2025, and this Amended Motion is filed pursuant to court order before the deadline, it is timely. See: _DE 192._

---

[4] The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2255(f), provides in relevant part: "A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of— (1) the date on which the judgment of conviction becomes final; (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action; (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence."

### B.    Ineffective Assistance of Counsel Standard

The Sixth Amendment guarantees criminal defendants the right to the effective assistance of counsel at all critical stages of a criminal proceeding[5]. See: _United States v. Cronic_, 466 U.S. 648, 659 (1984); See also: _Cannedy v. Adams_, 706 F.3d 1148, 1157 (9th Cir. 2013). This right is fundamental to ensuring a fair trial because it is counsel who ensures that the accused is not left to face the "prosecutorial forces of organized society" alone. See: _Maine v. Moulton_, 474 U.S. 159, 169 (1985); See also: _Strickland v. Washington_, 466 U.S. 668, 685 (1984) _(noting that "the right to counsel plays a crucial role in the adversarial system")_. When counsel's performance falls below an objective standard of reasonableness and prejudices the defendant, relief under § 2255 is warranted. See: _Strickland_, 466 U.S. at 686. To that end, in _Strickland_, the Supreme Court established a two-prong test for determining whether a criminal defendant was deprived of effective assistance of counsel. The often called _Strickland_ test requires a defendant to prove:

(1) Deficient Performance – The defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms; and (2 Prejudice – The defendant must show that but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different. See: _Strickland_, 466 U.S. at 687-88, 694.

To satisfy the deficient performance prong, a defendant must demonstrate that counsel's conduct was not within the range of competence demanded of attorneys in

---

[5] See: _U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right...to have the Assistance of Counsel for his defense.")_.

criminal cases. See: *McMann v. Richardson, 397 U.S. 759, 771 (1970).* Judicial scrutiny of counsel's performance must be highly deferential, and courts must apply a "strong presumption" that counsel's conduct fell within the wide range of reasonable professional assistance. See: *Strickland, 466 U.S. at 689*; See also: *Weygandt v. Ducharme, 774 F.2d 1491, 1493 (9th Cir. 1985).* This deference is not unlimited, however, and the presumption does not shield an attorney's fundamental failure to engage in the adversarial process.

Under the prejudice prong, a defendant must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. See: *Strickland, 466 U.S. at 694.* A "reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." See: *Id.* The defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case. See: *Id. at 693.* Instead, the focus is on whether counsel's errors were so serious as to deprive the defendant of a fair proceeding whose result is reliable.

Both prongs must be satisfied before a defendant can establish eligibility for relief. See: *Wildman v. Johnson, 261 F.3d 832, 838 (9th Cir. 2001).* That said, while the two-prong *Strickland* test provides the uniform standard for all ineffective assistance of counsel claims, its application is necessarily context-dependent. For example, the analysis of an attorney's failure to investigate a key witness differs from the analysis of a failure to object to a sentencing enhancement, just as an error during trial is viewed differently from an error on appeal. See: *Kimmelman v. Morrison, 477*

*U.S. 365, 384 (1986) (applying Strickland to pretrial failures)*; See also: *Glover v. United States, 531 U.S. 198, 203-04 (2001) (applying Strickland to errors at sentencing)*. The following sections will therefore apply the *Strickland* framework to the specific stage of Hernandez's proceedings at which each constitutional claims of error occurred.

### C.    Lanahan's Representation Was Constitutionally Defective, Rendering Hernandez's Guilty Plea Unknowing, Involuntary, and Unintelligent

The Sixth Amendment's guarantee of the effective assistance of counsel is not a right that lies dormant until the opening statements of trial; it is a constant shield, protecting an accused at every critical stage of the proceedings. See: *Missouri v. Frye, 566 U.S. 134, 143 (2012)*. The Supreme Court has unequivocally held that the plea-bargaining process is a "critical stage," as it is the phase in which the vast majority of criminal cases are resolved and a defendant's fate is sealed. See: *Padilla v. Kentucky, 559 U.S. 356, 364 (2010)*. The failure of counsel to provide competent representation at this juncture can poison the entire proceeding, rendering any subsequent conviction unreliable. See: *Lafler v. Cooper, 566 U.S. 156, 163 (2012)*. For a guilty plea to be constitutionally valid under the Due Process Clause, it must be a "voluntary and intelligent choice among the alternative courses of action open to the defendant." See: *Hill v. Lockhart, 474 U.S. 52, 56 (1985)*. This is a solemn requirement, as a plea of guilty is more than a mere confession; it is a conviction that waives a panoply of fundamental trial rights. See: *Boykin v. Alabama, 395 U.S. 238, 242-43 (1969)*. It is counsel's duty to provide the defendant with the information and advice necessary to make such a "knowing, voluntary, and intelligent" choice. Claims

of ineffective assistance during the plea process require the defendant to show that there is a reasonable probability that, "but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59.

In Hernandez's case, Lanahan's representation was a comprehensive failure that corrupted the entire plea process; each of which are discussed in turn below.

### 1.    Lanahan Rendered the Plea "Unknowing" by Failing to Investigate the Case and Failing to Explain the High Burden of Proving *Mens Rea*.

A guilty plea is constitutionally "knowing" only if the defendant possesses an accurate understanding of the law in relation to the specific facts of his case. See: *Brady v. United States*, 397 U.S. 742, 748 (1970). It is axiomatic that a defendant cannot make a knowing choice to plead guilty without a competent assessment of the evidence against him and the likelihood of the United States proving its case at trial. Counsel's duty to conduct a "reasonable investigation" is the indispensable predicate to providing this assessment. See: *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). "Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." See: *Strickland*, 466 U.S. at 690–91. A decision made in the absence of any meaningful investigation is, by definition, unreasonable.

Lanahan's failure to conduct any meaningful investigation led to him not advising Hernandez of the profound weaknesses in the United States's case. This was not a strategic choice to limit investigation; it was a wholesale abdication of his duty to investigate at all. An attorney cannot provide competent advice about a life-sentence plea agreement without first reading the evidence against his client. This is

not a debatable point; it is a baseline requirement of professional competence that Lanahan utterly failed to meet.

Because Lanahan did not investigate, he failed to appreciate—and thus failed to explain to Hernandez —the demanding *mens rea* requirement of the charges and the glaring holes in the United States's ability to prove it. A competent attorney would have explained that for a conspiracy to commit murder charge under 18 U.S.C. § 1117, the United States carried the heavy burden of proving beyond a reasonable doubt that Hernandez entered into an agreement with the specific intent to kill. See: *Holloway v. United States, 526 U.S. 1, 7 (1999)*. Instead of explaining this high evidentiary bar, Hernandez attests that Lanahan falsely advised him that because "it was a conspiracy...the government did not have to prove anything and that the jury would find me guilty regardless." See: *Hernandez Dec. ¶ 4*. This affirmative misstatement of the law, which trivialized the United States's burden on the most critical element, made it impossible for Hernandez to make a knowing and intelligent assessment of his chances at trial. This deficiency is magnified by the recent Supreme Court' jurisprudence, which has consistently reaffirmed the centrality of *mens rea* in federal criminal law. As the Court emphasized in *Ruan v. United States, 597 U.S. 450 (2022)*, the "presumption of scienter" is a foundational principle separating wrongful from innocent conduct. In a legal environment where the highest court is reinforcing the United State's high burden to prove criminal intent, an attorney's failure to explain this fundamental concept to a defendant facing a mandatory life sentence is constitutionally indefensible. A reasonably competent attorney would have

recognized that the United States's case, devoid of DNA, a murder weapon, or fingerprints linking Hernandez to the scene, hinged entirely on its ability to prove this specific intent through circumstantial evidence—a notoriously difficult task. Lanahan's failure to explain this critical weakness was a failure of breathtaking magnitude.

The prejudice from this failure is overwhelming. Had Lanahan competently advised Hernandez that the United States's case was entirely circumstantial and that it faced a high legal and factual burden to prove his specific intent to kill, there is more than a reasonable probability that Hernandez—who was already demanding a speedy trial—would have rejected the plea and forced the United States to its proof. The plea was not "knowing" because it was based on counsel's ignorance, not on an informed assessment of the risks.

### 2. Lanahan Rendered the Plea "Involuntary" and "Unintelligent" Through a Campaign of Coercion and Material Misrepresentation.

A guilty plea is constitutionally involuntary if it is induced by threats, misrepresentations, or other improper pressures that overbear the defendant's will. See: _Brady, 397 U.S. at 750_. Similarly, a plea is not "intelligent" if it is based on a gross mischaracterization of its direct consequences, most critically the sentence. See: _Id. at 755_. Lanahan's conduct was not sound legal advice; it was a campaign of intimidation and misinformation designed to secure a plea at all costs, rendering the plea both involuntary and unintelligent.

Lanahan's use of the death penalty was not a sober assessment of risk but a coercive cudgel. Hernandez attests that Lanahan flatly told him that if he did no

plead guilty he would without question be sentenced to death "as if it was already a pre-determined thing." See: *Hernandez Dec.* ¶ *4.* Lanahan allegedly created a high-pressure, false-urgency environment, telling Hernandez "you only have three days before they pull the plea and go for death." See: *Hernandez Dec.* ¶ *7.* While a defendant's fear of a possible death sentence does not automatically invalidate a plea, that principle presupposes that the advice leading to the plea is competent. When an attorney manufactures and exploits that fear to secure a plea, the advice crosses the line from competent counsel to unconstitutional coercion.

Most egregiously, Lanahan rendered the plea "unintelligent" by materially misrepresenting the sentence Hernandez would receive. Hernandez attests that Lanahan advised him that a plea would likely result in a sentence of "25-35 years." See: *Hernandez Dec.* ¶ *5.* This was a complete falsehood. The plea agreement itself, which Lanahan presumably reviewed, made a life sentence mandatory. A footnote in the agreement explicitly stated: "In the case of premeditated killing, life imprisonment is the appropriate sentence if a sentence of death is not imposed. A downward departure would not be appropriate in such a case." See: *DE 87, at 9 n.\*.* Advising a client that a 25-35 year sentence is likely when a mandatory life sentence is the undisputed legal reality is an inexcusable failure that falls far below any objective standard of reasonableness. It deprived Hernandez of the ability to make an "intelligent" choice because he was not weighing his actual options. He was weighing a fabricated choice between a supposed 25-35 year sentence and a supposedly certain death penalty at trial.

Put simply, Hernandez pleaded guilty because he was pressured by his attorney. See: *Hernandez Dec. ¶ 9*. This direct assertion, combined with the objective facts, confirms that but for Lanahan's unconstitutional conduct, Hernandez would have insisted on going to trial. His contemporaneous and repeated demands for a speedy trial serve as powerful corroborating evidence of his desire to fight the charges, a desire that was ultimately overborne by his own attorney's deficient performance. Confidence in the constitutional validity of this plea is not just undermined; it is destroyed.

### 3.     Lanahan Was Constitutionally Ineffective for Failing to Conduct Any Pre-Plea Investigation into the Physical and Forensic Evidence

The duty to investigate is a cornerstone of effective representation. Counsel must "make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. While a strategic decision to limit an investigation may be afforded deference, such a decision "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id*. A choice cannot be deemed strategic if it is made out of "inattention, not reasoned strategic judgment." *Wiggins*, 539 U.S. at 526. In the context of a guilty plea, this duty is paramount. A plea cannot be considered knowing, voluntary, and intelligent if the advice counsel provides is "not within the range of competence demanded of attorneys in criminal cases." *Hill*, 474 U.S. at 56. (quoting *McMann*, 397 U.S. at 771). Counsel cannot competently advise a client on the strength of the government's case if counsel has not made a reasonable effort to investigate that case. A failure to investigate a plausible line of defense or to

challenge the United States's physical evidence falls below the objective standard of reasonableness and renders any subsequent advice to plead guilty constitutionally suspect. See Also: _Tollett v. Henderson_, _411 U.S. 258, 267 (1973) (noting that a defendant may attack the voluntary and intelligent character of a guilty plea by showing that the advice he received from counsel was not within the required standards)._

Lanahan's pre-plea conduct was not merely deficient; it was a wholesale failure to engage in the most basic investigative functions of a defense attorney in a murder case. He failed to challenge the United States's forensic case at every turn, leaving Hernandez to make a life-altering decision based on a completely untested and one-sided presentation of the evidence. To that end, the United States's physical case was riddled with inconsistencies and evidentiary gaps that a competent attorney would have vigorously challenged. The firearm at issue was never recovered to even do ballistic testing nor did the shell casings match the weapon used See: _Hernandez Dec. ¶ 13_. When Hernandez questioned these issues the only response Lanahan provided was that "Mexico was refusing to hand over any physical evidence." See: _Hernandez Dec. ¶ 13_.

A reasonably competent attorney, confronted with a murder case where the murder weapon is missing and the foreign government is allegedly stonewalling on physical evidence, would have immediately recognized this as a profound weakness in the prosecution's case. Counsel would have filed pre-trial motions to compel the production of the shell casings for independent analysis, motions to dismiss for

spoliation or failure to preserve evidence, and motions in limine to exclude any speculative testimony about the ballistics. Lanahan's passive acceptance of the government's story and his failure to take any of these fundamental steps to challenge the forensic evidence was objectively unreasonable.

The absence of evidence can be as powerful as its presence. In a case of this nature, the complete lack of physical evidence linking Hernandez to the crime scene, the vehicle, or the victims was a powerful exculpatory fact. A competent attorney would have retained a forensic investigator to document this absence of physical evidence and prepare to argue forcefully to a jury that the United States's case, resting solely on the testimony of a cooperating co-defendant, was entirely uncorroborated by science. Lanahan's failure to investigate and build a defense around this exculpatory "non-evidence" was a gross oversight.

The most damning indictment of Lanahan's failure to investigate is his failure to discover evidence that actively pointed to another individual's involvement. This evidence, which we now know existed was learned by Hernandez only after he pleaded guilty. This evidence that could have easily been discovered by Lanahan was direct, physical evidence supporting a theory of innocence and confirms that Aguilar and not Hernandez was the shooter. The prejudice flowing from this failure is significant as the likelihood that had Hernandez known it prior to his guilty plea he would not have pleaded guilty and would have insisted on going to trial. *474 U.S. at 59.* Indeed, had Lanahan conducted a reasonable pre-plea investigation, he would have been able to advise Hernandez not about the United States's stated case, but

about the reality of the case: a prosecution built entirely on the word of a cooperating co-defendant, with no murder weapon, no DNA, no fibers, no blood evidence, and, most critically, physical evidence (fingerprints) pointing to someone else's involvement. No rational defendant, when advised of these profound weaknesses in the government's case, would choose to plead guilty and accept a mandatory life sentence. The decision to reject the plea and proceed to trial would have been the only logical choice.

### D.     Lanahan Was Constitutionally Ineffective During the Pre-Trial Phase for Failing to Honor Hernandez's Request to Assert His Right to a Speedy Trial

While an attorney retains control over trial tactics and strategic decisions, this authority is not absolute and does not extend to unilaterally overriding a client's express instruction to assert a fundamental constitutional right. See: *Jones v. Barnes, 463 U.S. 745, 751 (1983).* When counsel, armed with a clear client directive and a sound strategic basis, fails to assert a right as fundamental as a speedy trial, that failure is not a "strategic choice" to be afforded deference; it is a profound dereliction of duty.   Here, Lanahan's outright refusal to honor Hernandez's repeated and strategically sound instructions to assert his Sixth Amendment was not a tactical decision; it was an unreasonable dereliction that directly and foreseeably allowed the United States to transform a weak, circumstantial case into a prosecutable one. This single pre-trial failure irrevocably damaged Hernandez's defense and directly led to the coercive plea negotiations that followed.

A reasonably competent attorney, when instructed by his client to assert a speedy trial right—particularly when the strategic rationale for doing so is obvious—

has a constitutional duty to act. The right to a speedy trial is enshrined in the Sixth Amendment, and its denial is assessed by the four factors articulated in _Barker v. Wingo_: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) the resulting prejudice. _407 U.S. 514, 530 (1972)._ Here, Hernandez persistently asserted his right from the very first meeting, providing Lanahan with the necessary trigger to put the United States and the Court on notice. See: _Hernandez Dec. ¶ 2._ Hernandez was no stranger to this strategy, having successfully asserted his speedy trial rights in a related federal matter just months prior, demonstrating his request was informed and not a naive whim. See: _Id._ The strategic reason for Hernandez's request was unassailable: the United States's case was entirely circumstantial and, critically, it lacked its star witness, Aguilar, who had not yet been apprehended. See: _DE 23; Hernandez Dec. ¶¶ 2, 12._ Forcing a prompt trial would have compelled the United States to proceed on a threadbare case, devoid of its central cooperating witness. A competent advocate would have immediately recognized this immense tactical advantage and zealously pursued his client's instructions.

Instead of honoring his client's strategically brilliant directive, he responded with hostility and unprofessional threats. Hernandez attests that Lanahan reacted to his speedy trial demand by "arguing, trying to yell, and threatening to quit." See: _Hernandez Dec. ¶ 3._ The reasons Lanahan gave for the delay—that the case was "too big" and that he "needed time"—were justifications for his own convenience, not a strategy to benefit his client. See: _Id._ By unilaterally overriding his client's explicit

instructions on a matter of fundamental constitutional importance, Lanahan abandoned his role as a zealous advocate and instead acted as a de facto agent of delay for the prosecution. This is precisely the type of pre-trial failure that _Kimmelman_ holds to be constitutionally deficient. This was not a strategic choice; it was a failure to engage in the adversarial process.

In the context of a pre-trial error, prejudice is established by demonstrating a reasonable probability that, but for the error, the outcome of the proceeding would have been different. See: _Lafler, 566 U.S. at 163-64._ The delay Lanahan single-handedly engineered gave the United States the exact breathing room it needed to salvage its case. Before the delay, the United States's case was a house of cards, built on circumstantial evidence with no confession, no DNA, and no firearm. After the delay, the United States had a kingpin witness. During this period of delay, the United States located and arrested Aguilar, secured his cooperation, and built its entire prosecutorial narrative around his testimony.

But for Lanahan's failure, there is a reasonable probability that the United States would have been forced to proceed to trial on a far weaker case, which would have dramatically altered the plea-bargaining landscape and the ultimate outcome of the entire case. A life sentence plea would have been untenable for the United States to demand, and irrational for the defense to accept. Lanahan's failure to assert the speedy trial right was the first domino to fall in a series of constitutional errors that led directly to Hernandez's coerced plea and life sentence. Confidence in the outcome of a proceeding so fundamentally compromised at the outset is impossible.

### E.    Lanahan Was Ineffective for Failing to Move to Withdraw the Guilty Plea After the Emergence of Overwhelming Exculpatory Evidence

The Sixth Amendment's guarantee of effective assistance of counsel does not evaporate upon the entry of a guilty plea; rather, it persists as a vital safeguard through the finality of sentencing. See: *U.S. Const. amend. VI.* This duty becomes paramount when, during the crucial interregnum between plea and sentencing, new and powerfully exculpatory evidence emerges that calls into question the factual basis for the conviction. In such circumstances, competent counsel has an absolute obligation to act decisively by moving to withdraw the plea. Lanahan's failure to do so for Hernandez was not a tactical miscalculation; it was a multi-faceted constitutional collapse which ultimately resulted in the most severe prejudice imaginable: the imposition of a mandatory life sentence upon a defendant armed with compelling, newly discovered proof of his actual innocence.

### 1.    The Legal Framework Governing Post-Plea Duties and Plea Withdrawals

The legal architecture governing the withdrawal of a guilty plea is designed to be a crucial safety valve, ensuring that a conviction resting on a plea remains fundamentally fair and just. This framework imposes clear, non-negotiable duties on defense counsel to act when circumstances expose the fallibility of a prior plea.  To that end, Fed. R. Crim. P. 11(d)(2)(B) provides the procedural mechanism for a defendant to correct an improvident plea before sentence is imposed, stating that a defendant may withdraw a plea if "the defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). The Ninth Circuit has long

and consistently held that this standard is to be applied liberally to promote justice. See: *United States v. McTiernan, 546 F.3d 1160, 1167 (9th Cir. 2008).* Indeed, there can be no more quintessential "fair and just reason" for withdrawal than a credible, newly supported claim of actual innocence. See: *United States v. Showalter, 569 F.3d 1150, 1154-55 (9th Cir. 2009) (identifying a claim of innocence as a dispositive factor in the analysis).*

To guide this inquiry, the Ninth Circuit weighs a series of factors, including: (1) the strength of the defendant's proffered reasons for withdrawal; (2) the defendant's assertion of innocence; (3) the length of time between the plea and the withdrawal motion; and (4) the potential prejudice to the United States if the motion is granted. See: *McTiernan, 546 F.3d at 1167.* A defendant's presentation of newly discovered, exonerating evidence that fundamentally undermines the prosecution's case is one of the most powerful reasons a court can consider. The standard is not whether the defendant proves his innocence by a preponderance, but whether fairness and justice, under the totality of the circumstances, demand that he be permitted to put the United States to its constitutional burden of proof at trial.

The decision to file a motion to withdraw a plea is not a matter of mere client preference; it is a fundamental component of constitutionally effective representation. See: *ABA Standards for Criminal Justice, Defense Function § 4-5.15(A).* When a meritorious basis for such a motion arises, a reasonably competent attorney is duty-bound to pursue it. This duty is informed by several core Sixth Amendment obligations. First is the duty to investigate. See: *Strickland at 691.* If

counsel is ineffective for failing to investigate mitigating evidence for sentencing, they are undeniably ineffective for failing to investigate exonerating evidence pre-sentencing that could negate the conviction entirely. See: *Williams v. Taylor, 529 U.S. 362, 395 (2000).* Second is the duty to provide competent advice. A defendant is "entitled to the effective assistance of counsel in making the choice to adhere to her plea or to withdraw it." *Burt v. Titlow, 571 U.S. 12, 23 (2013) (Ginsburg, J., concurring).* Advice that is affirmatively incorrect on a fundamental procedural rule, depriving the client of the ability to make an informed choice, is the antithesis of effective assistance. See Also: *Padilla, 559 U.S. 356 (holding failure to advise on clear legal consequences of a plea constitutes ineffective assistance).*

Counsel's failure to file a motion to withdraw a plea that has a substantially likelihood of succeeding, particularly when that failure stems from a misunderstanding of the law or a failure to investigate, constitutes deficient performance under *Strickland.* See: *McTiernan, 546 F.3d at 1168.* It is not a defensible "strategy" to remain ignorant or to ignore evidence that directly exonerates one's client. See Also: *Brody Law Firm case (Georgia Court of Appeals case finding counsel ineffective for failing to investigate and make a record regarding potential violations affecting plea withdrawal).*

### 2. Lanahan's Failures Fell Below Any Objective Standard of Reasonableness

After Hernandez was coerced into pleading guilty, substantive evidence of his innocence emerged from three distinct and independent sources. This was not merely cumulative or impeaching evidence; this was direct, exonerating evidence that

shattered the credibility of the United States's chief cooperator. This creditability failure dismantled the factual basis for Hernandez's plea. Indeed, not one but three independent sources confirmed that it was Aguilar and not Hernandez who was responsible for the heinous conduct alleged in the indictment.

Armed with this veritable arsenal of new evidence, Hernandez did exactly what any innocent person would do: he immediately, repeatedly, and desperately implored Lanahan to file a motion to withdraw his guilty plea. See: *Hernandez Dec.* ¶ *9.* A reasonably competent attorney would have immediately recognized the duty to investigate these explosive leads. Lanahan, however, did nothing. His refusal to even attempt to secure updated sworn affidavits from Jay and Mike Aguilar, to interview Luis Cardenas, or to otherwise corroborate this wealth of information was a complete abdication of his duty to investigate under *Strickland* and *Williams*. There is no conceivable strategy in willful ignorance.

Lanahan's refusal to act was not based on a reasoned, strategic assessment. Instead, he gave Hernandez advice that was objectively and demonstrably false. Lanahan's advisement to Hernandez that it was "too late" to file the motion and that the judge "was not going to allow it because it was too close to sentencing" (See: *Hernandez Dec.* ¶ *9)* runs afoul of the plain text of Fed. R. Crim. P. Procedure 11(d)(2). The rule expressly permits a motion to withdraw a plea at any point "before the court imposes sentence." Counsel cannot be said to be functioning as the "counsel" guaranteed by the Sixth Amendment when his advice is based not on a tactical choice, but on a demonstrable misunderstanding of the plain text of the Federal Rules of

Criminal Procedure. Lanahan's erroneous advice on this critical procedural matter deprived Hernandez of his right to make an informed choice about whether to adhere to his plea, a direct violation of his Sixth Amendment rights. See: *Burt, 571 U.S. at 23 (Ginsburg, J., concurring).*

Lanahan's deficiency is magnified by his simultaneous failure to recognize and act upon a clear constitutional violation by the United States. The United States has an affirmative duty under *Brady v. Maryland, 373 U.S. 83 (1963)*, to disclose material exculpatory evidence to the defense. This duty is not suspended during plea negotiations. See: *Sanchez v. United States, 50 F.3d 1448, 1453 (9th Cir. 1995).* The evidence from Jay and Mike Aguilar—that the United States's key witness confessed to the crime and exonerated Hernandez—was not mere impeachment material. It was substantive, exculpatory evidence of Hernandez's factual innocence. While the Supreme Court in *United States v. Ruiz, 536 U.S. 622 (2002),* held that the duty does not extend to disclosing impeachment evidence pre-plea, it explicitly left open the question of whether the failure to disclose purely exculpatory evidence would render a plea involuntary. A growing body of law and scholarship recognizes that a plea cannot be "knowing, voluntary, and intelligent" if the prosecution withholds evidence of actual innocence. The United States's failure to disclose the identities and statements of Jay and Mike Aguilar until months after the plea constituted an egregious *Brady* violation that provided its own powerful, independent basis for withdrawal.

The materiality of this evidence is beyond dispute. See: *United States v. Bagley*, *473 U.S. 667, 682 (1985)*. In the plea context, this means there is a reasonable probability that had Hernandez known that Aguilar's own brothers told the FBI he was not involved, he would have refused to plead guilty. The answer is self-evidently yes.

### 3.    Hernandez Suffered Staggering and Undeniable Prejudice

Had the Court been presented with a timely motion to withdraw Hernandez's plea it would undoubtably analyzed it under the *McTiernan* factors. That analysis overwhelmingly favors withdrawal. Specifically:

**Strength of Reasons:** Hernandez's reasons were exceptionally strong. He presented newly discovered, multi-sourced, exculpatory evidence of his actual innocence, coupled with a meritorious claim of a *Brady* violation by the United States. This is the strongest possible foundation for a withdrawal motion.

**Assertion of Innocence**: Hernandez's assertion of innocence was immediate, consistent, and directly prompted by the discovery of the new evidence. This was not a case of "buyer's remorse"; it was a principled stand based on objective facts.

**Timeliness:** Hernandez implored Lanahan to file the motion as soon as he learned of the evidence. Any delay in filing would be attributable solely to Lanahan's erroneous advice and inaction—a factor the court would hold against the attorney, not the client.

**Prejudice to the United States:** The prejudice to the United States would have been minimal to none. The Ninth Circuit has been clear that "the government

is not prejudiced by having to prove its case at trial," as this is its fundamental burden, not a cognizable harm. See: _United States v. Garcia_, _401 F.3d 1008, 1013 (9th Cir. 2005)_. The United States could not point to lost evidence or unavailable witnesses; therefore, this factor would weigh heavily in Hernandez's favor.

Given this analysis, there is far more than a reasonable probability that the district court would have found a "fair and just reason" and granted the motion to withdraw. As a result, the prejudice stemming from Lanahan's failure is massive. For Hernandez, the decision to proceed to trial would not have just been rational; it would have been the only rational choice for an innocent man suddenly armed with sworn testimony from the star witness's own mother that he was not at the scene of the crime. See: _Jae Lee v. United States_, _582 U.S. 357 (2017) (explaining that prejudice can be met where a defendant has plausible strategic reasons for rejecting a plea, even if conviction at trial seems likely)_. Here, Hernandez had more than a plausible reason; he had an overwhelming case for acquittal. At trial, the United States's entire case against Hernandez rested on the credibility of Aguilar. With the plea withdrawn, Hernandez would have been armed with an arsenal of evidence to demolish that credibility. Lanahan's deficient performance deprived Hernandez of this opportunity. His multi-faceted failure—to investigate, to advise, and to act— blocked Hernandez's only path to presenting his powerful innocence defense to a jury. This failure led directly, foreseeably, and inexorably to the imposition of a mandatory life sentence. Confidence in a result obtained under such circumstances is not merely undermined; it is, as a matter of law and fundamental fairness, completely destroyed.

The facts alleged by Hernandez, if true, establish a clear claim of ineffective assistance of counsel and, at a minimum, require an evidentiary hearing for their full exploration and resolution. See: _McTiernan, 546 F.3d at 1164._

### F.   The Conviction Was Obtained Through a Blatant _Brady_ Violation Compounded by Counsel's Ineffective Assistance

The adversarial system of justice is not a game of ambush; it is a search for truth, governed by principles of fundamental fairness enshrined in the Due Process Clause of the Fifth Amendment. Central to this guarantee is the prosecution's absolute and unyielding duty to disclose favorable, material evidence to the accused. See: _Brady, 373 U.S. at 87._ When the United States suppresses evidence of a defendant's innocence, it "casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice." _Id._ This constitutional transgression is then catastrophically compounded when defense counsel—the accused's sole shield against the immense power of the federal government—fails to recognize, investigate, or act upon the United States's misconduct.

In _Brady_ the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." _373 U.S. at 87._ This is not a procedural courtesy but a constitutional mandate. To establish a _Brady_ violation, a defendant must show that: (1) the evidence was favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) prejudice ensued because the evidence was material. See:

*Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). To that end, defense counsel is not a passive spectator in the discovery process. The Sixth Amendment demands that counsel be a proactive and diligent advocate in seeking out and using favorable evidence. See: *Discovery From the Trenches: The Future of Brady, UCLA Law Review.* When counsel becomes aware that the United States has violated its *Brady* obligations, they have an absolute duty to act. This includes filing appropriate motions—such as a motion to withdraw a guilty plea—to remedy the constitutional violation. See: *McKnight v. State*, 1 N.E.3d 193 (Ind. Ct. App. 2013) (finding counsel ineffective for failing to investigate and present a Brady claim). A failure to file a meritorious motion based on a clear *Brady* violation cannot be excused as "trial strategy." Such a failure constitutes deficient performance under *Strickland*, 466 U.S. 668.

## 1.    Lanahan's Performance Was Objectively Unreasonable

Lanahan's representation in the face of a blatant *Brady* violation was a textbook example of deficient performance. He was confronted with clear evidence of United States misconduct and chose to do nothing, sealing Hernandez's fate. Applying the three-pronged *Brady* test to the facts of this case, it is undeniable that the United States violated Hernandez's due process rights. Each are discussed in turn below.

The Evidence Was Favorable and Exculpatory: The United States possessed statements from Hernandez's half-brothers, Jay and Mike Aguilar. As previously noted, these statements revealed that Aguilar had committed the murders and that

Hernandez was not present. See: *Hernandez Dec. ¶ 10*. This is the definition of powerfully exculpatory evidence. It is not mere impeachment material; it is substantive evidence of Hernandez's factual innocence.

**The Evidence Was Suppressed:** The United States had this evidence "all along" but failed to disclose it before Hernandez pleaded guilty. See: *Hernandez Dec. ¶ 10*. The eventual disclosure, months after the plea and in a uselessly redacted format that concealed the witnesses' identities until weeks before sentencing, constitutes suppression. See: *Leka v. Portuondo, 257 F.3d 89, 103 (2d Cir. 2001) (holding that late disclosure is tantamount to suppression).*

**The Evidence Was Material:** There is a reasonable probability that, had this evidence been disclosed, Hernandez would have rejected the plea and insisted on trial. See: *Hill, 474 U.S. at 59*. No rational defendant would plead guilty to a life sentence knowing the government possessed evidence from the star witness's own family that exonerated him.

When Hernandez learned of this constitutional violation, he brought it to his attorney's attention. Lanahan's response was a shocking display of indifference and ineffectiveness. According to Hernandez, Lanahan dismissed the clear *Brady* violation, claiming "it wouldn't make a difference." See: *Hernandez Dec. ¶ 12*. This statement is, in itself, an admission of constitutionally deficient performance. A reasonably competent attorney would have immediately recognized this as an independent and powerful basis to file a motion to withdraw the guilty plea. Lanahan's failure to investigate the claim, research its applicability, and file a motion

was not a strategic decision; it was a complete failure to function as the "counsel" guaranteed by the Sixth Amendment. Such a violation provides the "fair and just reason" required for withdrawal under Rule 11. See: *United States v. Pelullo, 105 F.3d 117, 122 (3d Cir. 1997).* Had the motion been granted, Hernandez would have faced a choice: re-enter a guilty plea to a life sentence, or proceed to trial armed with evidence that the United States's star witness had confessed to the crime. Under the "rational defendant" test of *Padilla, 559 U.S. 356,* and *Jae Lee, 582 U.S. 357,* any rational defendant in this position would have insisted on going to trial. Lanahan's failure deprived Hernandez of this opportunity and led directly to his life sentence.

The United States will undoubtedly argue that this claim is barred by Hernandez's guilty plea and his failure to raise it on direct appeal. However, the United States's inevitable procedural default argument fails because the cause for the default was the very ineffective assistance of counsel that is the subject of this motion. In *Massaro v. United States, 538 U.S. 500 (2003),* the Supreme Court definitively held that an ineffective assistance of counsel claim may, and in fact should, be raised for the first time in a § 2255 motion, even if it could have been raised on direct appeal. *Id. at 504.* The Court reasoned that ineffective assistance of counsel claims often rely on facts outside the trial record—such as off-the-record conversations between an attorney and client—that are best developed in a collateral proceeding where an evidentiary hearing can be held. See: *Id. at 505-06.*

Here, Lanahan's failure to recognize and act upon the *Brady* violation is the IAC claim. This failure is what caused the *Brady* issue to go unaddressed at the trial

level and, consequently, on appeal. It would be a perverse and circular logic to hold that counsel's failure to raise an issue can bar a subsequent claim based on that very failure. Under *Massaro*, Lanahan's ineffectiveness serves as both the substance of the claim and the "cause" sufficient to excuse any procedural default.

### G.    An Evidentiary Hearing Is Required to Resolve the Myriad Factual Disputes That Pervade This Motion

In the Ninth Circuit, the standard for obtaining an evidentiary hearing on a § 2255 motion is clear, well-established, and is not a high bar to clear. Indeed, where a defendant presents factual allegations that would entitle him to relief if true, a hearing is considered "mandatory." See: *United States v. Howard, 381 F.3d 873, 877 (9th Cir. 2004)*. Under § 2255(b), a district court must hold an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." A district court may only forego an evidentiary hearing if the petitioner's allegations (1) are "palpably incredible or patently frivolous," or (2) are "conclusively resolved by the record." See: *United States v. Schaflander, 743 F.2d 714, 717 (9th Cir. 1984)*.  Neither of these exceptions applies here. Hernandez's allegations, detailed throughout this motion and his accompanying declaration, are specific, fact-based, and entirely plausible within the troubling context of this case. Far from being refuted by the record, they primarily concern extra-record events that the existing files cannot, by their very nature, address. This Circuit has been particularly clear that when a defendant's claim hinges on interactions with counsel that occurred off the record, a hearing is almost always necessary. A petitioner's "sworn affidavit, unless demonstrably false, is precisely the

sort of evidence that requires a hearing." See: *Howard, 381 F.3d at 882*. The court has recognized the fundamental principle that credibility determinations—pitting a petitioner's sworn statement against a silent record or a future denial by counsel—cannot be made on paper. See: *McTiernan, 546 F.3d at 1164*. The resolution of such factual disputes "requires a hearing where the district court can observe the demeanor of the witnesses." See: *Id.*

More specifically, a hearing is absolutely essential to resolve Hernandez's powerful claim that his plea was the product of Lanahan's coercion and misinformation. Hernandez has sworn that Lanahan repeatedly threatened him with a certain death penalty (See: *Hernandez Dec. ¶ 4*), created a false sense of urgency with a three-day deadline (See: *Hernandez Dec. ¶ 7*), and materially misrepresented the sentence by suggesting a 25-35 year term was likely when life was mandatory (See: *Hernandez Dec. ¶ 5*). These alleged conversations are the single most powerful pieces of evidence that the plea was involuntary. These are classic extra-record facts. The existing record is completely silent as to what Lanahan actually advised Hernandez. Did Lanahan fairly explain the risks, or did he engage in unconstitutional coercion? The only way for this Court to resolve this central factual dispute is to hear live testimony from both men under oath. Just as, Hernandez's claim that Lanahan refused to honor his repeated and strategically sound requests to assert his speedy trial right also turns entirely on off-the-record conversations. Hernandez has sworn that from his very first meeting with Lanahan, he demanded a speedy trial and that Lanahan responded with hostility and threats to quit. (See:

*Hernandez Dec. ¶¶ 2-3).* The United States will undoubtedly argue that the delay was a strategic choice. But was it? Or was it, as Hernandez attests, an unreasonable dereliction of duty in the face of an explicit client directive? The Court cannot determine the reasonableness of Lanahan's conduct without first establishing the underlying facts of what was said, which requires testimony that can only be elicited and tested at a hearing. As it relates to Lanahan' failure to investigate – live testimony would allow the Court to determine:

> **The Failure to Withdraw the Plea:** Why did Lanahan refuse to file a motion to withdraw the plea after the emergence of overwhelming exculpatory evidence from three independent sources? Was his advice that it was "too late" a strategic assessment or a negligent misstatement of the law? (See: *Hernandez Dec. ¶ 9*).

> **The Failure to Act on the _Brady_ Violation:** Why did Lanahan dismiss the government's blatant _Brady_ violation by claiming it "wouldn't make a difference"? Did he conduct any research on the issue? (See: *Hernandez Dec. ¶ 11*).

> **The Failure to Investigate Physical Evidence:** Why did Lanahan fail to investigate the missing murder weapon, the lack of DNA, or the third-party fingerprints on the shell casings? Was this a choice or, as his own investigator allegedly stated, a result of his failure to even review the discovery pre-plea? (See: *Hernandez Dec. ¶¶ 13-15*).

The answers to these questions are not in the record. They lie in the privileged, off-the-record conversations between a client and his attorney and in the unstated reasoning behind counsel's actions—facts that can only be developed in a collateral proceeding where an evidentiary hearing can be held. See: *Massaro, 538 U.S. at 505-06.* The only constitutionally adequate procedure for resolving these dispositive factual disputes is an evidentiary hearing where the Court can observe the demeanor of the witnesses and make the necessary credibility determinations.

## IV.    CONCLUSION

The charges in this case are horrific. The murder of five people, including three young children, represents a tragedy of immeasurable proportions, and the need for justice for the victims is undeniable. Nothing in this motion is intended to diminish the gravity of that loss. Our system of justice, however, is built upon a principle that is even more enduring than the understandable outrage such a crime provokes: the principle that the process by which we secure a conviction must be fundamentally fair. The constitutional guarantees of due process and the effective assistance of counsel are not privileges reserved for the popular or courtesies for the sympathetic; they are the absolute and non-negotiable bedrock of our legal system. See: *U.S. Const. amend. VI*. The Constitution does not contain carve-outs for defendants accused of heinous crimes. To the contrary, it is precisely in cases like this—where the stakes are the highest and the public's desire for retribution is most acute—that our commitment to these principles is most severely tested and must be most rigorously applied. See: *Strickland, 466 U.S. at 685 (explaining the right to counsel is critical to the "fundamental fairness of the proceeding")*.

Hernandez's conviction and mandatory life sentence are not the product of a fair and reliable adversarial process. They are the direct result of a catastrophic and systemic breakdown of his Sixth Amendment rights, brought about by the profound ineffectiveness of Lanahan. These were not isolated mistakes or forgivable lapses in judgment. They were a series of interconnected constitutional failures that

dismantled the adversarial process at every critical stage and produced a result that is fundamentally unreliable. A conviction obtained through such a process cannot stand. Justice is not served when a life sentence is secured through constitutionally deficient counsel. When the very mechanisms designed to ensure reliability—investigation, zealous advocacy, and adherence to due process—have completely collapsed, the resulting judgment is inherently untrustworthy. A mandatory life sentence, secured through a process so thoroughly riddled with constitutional error, is not justice; it is a fundamental defect that this Court has the power and the solemn duty to correct.

**WHEREFORE** for the reasons set forth in his §2255 Motion and more fully detailed in this Memorandum, Hernandez respectfully requests that this Court grant his motion, schedule an evidentiary hearing to allow him to prove the factual allegations contained herein, vacate his conviction and sentence, and grant such other relief as the Court deems just and proper.

*Respectfully Submitted,*

**Christopher Baltezar Hernandez**
Reg Number: 69593-112
USP Hazelton
U. S. Penitentiary
P.O. Box 2000
Bruceton Mills, WV 26525

# CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that on this  31  day of October 2025

did forward a true and correct copy of the foregoing Memorandum– via the United

States Postal Service, using postage pre-paid means, to the person(s) listed below:

Assistant United States Attorney
Southern District of California
Jacob Weinberger United States Courthouse
325 West F Street
San Diego, California 92101

**ORIGINAL TO:**
United States District Court Clerk
Southern District of California
Jacob Weinberger United States Courthouse
325 West F Street
San Diego, California 92101

**WITNESS MY HAND THIS  31  DAY OF OCTOBER 2025**

_____                    _____
Witness                                     Christopher Baltezar Hernandez

# EXHIBIT "A"

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| **Plaintiff / Respondent** | ) |
| | ) |
| **v.** | ) Case No: <u>3:22-cr-00778-</u> |
| | ) |
| **CHRISTOPHER BALTEZAR,** | ) |
| **HERNANDEZ** | ) |
| **Defendant / Movant,** | ) |
| ——————————————— | ) |

## <u>DECLARATION OF</u>
## <u>CHRISTOPHER BALTEZAR HERNANDEZ</u>
### * * * * * * * *

I, Christopher Baltezar Hernandez, hereby declare under penalty of perjury under that the following is true and correct to the best of my knowledge and belief:

1)    I am the defendant/movant in the above captioned proceeding. I am over the age of eighteen, of sound mind, and competent to make this declaration. The facts stated herein are based on my personal knowledge of the events that occurred during my above captioned criminal case.

2)    From the very first meeting with my appointed attorney, John Owen Lanahan ("Lanahan"), in November 2022 at the GEO detention facility, I explicitly and repeatedly told him that I wanted to assert my Sixth Amendment right to a speedy trial. My request was based on my experience in a prior federal case where asserting my speedy trial right had been successful, and my belief that the United

States' case against me was weak and entirely circumstantial. At that time, my co-defendant and brother, Victor Armondo Aguila ("Aguilar"), had not yet been arrested, and I knew the United States's case depended on securing his cooperation.

3)      Lanahan refused my request. He responded to my speedy trial demand by arguing, yelling, and threatening to quit as my lawyer. He told me the case was "too big" and that he "needed time." The delay he created gave the United States the time it needed to apprehend my brother in January 2023 and secure his cooperation against me. If Lanahan had honored my request as I instructed, my brother would have never had the chance to testify against me.

4)      Lanahan never explained the charges against me in a way I could understand. He told me that because "it was a conspiracy...the government did not have to prove anything and that the jury would find me guilty regardless." He never explained the concept of *mens rea* or the high burden the United States had to prove that I had the specific intent to kill.

5)      Lanahan told me that if I pleaded guilty, I would likely receive a sentence of 25-35 years. He did not explain that a life sentence was mandatory under the plea agreement, and I believed, based on his advice, that a term of years was a possible and likely outcome.

6)      During my plea hearing on December 21, 2023, I expressed my confusion and disagreement with the factual basis read by the prosecutor. I told Mr. Lanahan I disagreed with what was being said. He assured me that we could address and correct these issues at sentencing, so I did not object further in open court.

7)      Lanahan repeatedly told me that if I did not sign the plea, I would get the death penalty, "as if it was already a pre-determined thing." He created a false sense of urgency, telling me at one point, "you only have three days before they pull the plea and go for death."

8)      I was only given about one hour over two days to review any discovery materials before being pressured to decide on a plea agreement that carried a life sentence. My investigator, Taylor Minas, later told me that Lanahan did not review any of the discovery before I pleaded guilty because he asked her to review it for him well after my plea was entered.

9)      I pleaded guilty on December 21, 2023, because I felt pressured by Lanahan and his constant threats of the death penalty. Based on his advice, I believed I had no chance at trial and that I had to plead guilty to avoid certain death.

10)     After I pleaded guilty, I learned about new evidence of my innocence from three separate sources. First, I learned that the United States had long possessed statements from my half-brothers, Jay and Mike Aguilar, in which they told the FBI that my brother, Victor Aguilar, had confessed to them that he committed the murders and that I was not present. I did not learn their identities until weeks before my sentencing. Second, at the evidentiary hearing on October 2, 2024, Victor Aguilar's mother, Tanya Neil, testified under oath that her son told her I "was not there at the crime scene during the night of the murders." Third, I was informed that another inmate, Luis Cardenas, had provided a sworn affidavit stating

that Victor Aguilar boasted to him about being the "sicario" who committed the murders.

11)     When this new, overwhelming evidence of my innocence came to light, I immediately and repeatedly asked Lanahan to file a motion to withdraw my guilty plea. He refused. He told me it was "too late" and that "the judge was not going to allow it because it was too close to sentencing." He also refused to file a motion based on the Unite States's failure to timely turn over evidence telling me it "would not make a difference."

12)     I also learned after my plea, through my new investigator, that the government's physical evidence was virtually nonexistent. Most critically, I learned that someone else's fingerprints—not mine and not my brother's—were found on the shell casings.

13)     A firearm was never recovered to even do ballistic testing. I was never shown the shell casings recovered from the crime scene, only photographs. Lanahan told me that "Mexico was refusing to hand over any physical evidence." He never challenged this or filed any motions to compel production or to inspect this evidence.

14)     I declare under penalty of perjury that the foregoing is true, correct and accurate.

WITNESS MY HAND THIS _31_ DAY OF OCTOBER, ~~2025~~

_____
Christopher Baltezar Hernandez

# CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that on this  31   day of October 2025 did

forward a true and correct copy of the foregoing Declaration – via the United States

Postal Service, using postage pre-paid means, to the person(s) listed below:

Assistant United States Attorney
Southern District of California
Jacob Weinberger United States Courthouse
325 West F Street
San Diego, California 92101

**ORIGINAL TO:**
United States District Court Clerk
Southern District of California
Jacob Weinberger United States Courthouse
325 West F Street
San Diego, California 92101

**WITNESS MY HAND THIS  31  DAY OF OCTOBER 2025**

_____
Witness

_____
Christopher Baltezar Hernandez

AO 243 (Rev. 09/17)

# Motion to Vacate, Set Aside, or Correct a Sentence
## By a Person in Federal Custody

### (Motion Under 28 U.S.C. § 2255)

### Instructions

1. To use this form, you must be a person who is serving a sentence under a judgment against you in a federal court. You are asking for relief from the conviction or the sentence. This form is your motion for relief.

2. You must file the form in the United States district court that entered the judgment that you are challenging. If you want to challenge a federal judgment that imposed a sentence to be served in the future, you should file the motion in the federal court that entered that judgment.

3. Make sure the form is typed or neatly written.

4. You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

5. Answer all the questions. You do not need to cite law. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit any legal arguments, you must submit them in a separate memorandum. Be aware that any such memorandum may be subject to page limits set forth in the local rules of the court where you file this motion.

6. If you cannot pay for the costs of this motion (such as costs for an attorney or transcripts), you may ask to proceed *in forma pauperis* (as a poor person). To do that, you must fill out the last page of this form. Also, you must submit a certificate signed by an officer at the institution where you are confined showing the amount of money that the institution is holding for you.

7. In this motion, you may challenge the judgment entered by only one court. If you want to challenge a judgment entered by a different judge or division (either in the same district or in a different district), you must file a separate motion.

8. When you have completed the form, send the original and _____ copies to the Clerk of the United States District Court at this address:

**Clerk, United States District Court for**
**Address**
**City, State  Zip Code**

If you want a file-stamped copy of the petition, you must enclose an additional copy of the petition and ask the court to file-stamp it and return it to you.

9. **<u>CAUTION:</u> You must include in this motion all the grounds for relief from the conviction or sentence that you challenge. And you must state the facts that support each ground. If you fail to set forth all the grounds in this motion, you may be barred from presenting additional grounds at a later date.**

10. **<u>CAPITAL CASES:</u> If you are under a sentence of death, you are entitled to the assistance of counsel and should request the appointment of counsel.**

Use. Reuse. Recycle.

PULL TAB TO OPEN



Visit **UPS.com**

**Apply shipping documents on this side.**

**Scan QR code to schedule a pickup**

This envelope is for use with the following services:
- **UPS Next Day Air®**
- **UPS Worldwide Express®**
- **UPS 2nd Day Air®**

Do not use this envelope for: **UPS Ground** / **UPS Standard**

**Domestic Shipments**
- To qualify for the letter rate, UPS Express® env correspondence, urgent documents, and/or el 8 oz. or less. UPS Express envelopes containing or weighing more than 8oz. will be billed by w

**International Shipments**
- The UPS Express envelope may be used only f value. Certain countries consider electronic m ups.com/importexport to verify if your shipm

- To qualify for the letter rate, the UPS Express e UPS express envelopes weighing more than 8

**Note:** UPS Express envelopes are not recomme electronic media containing sensitive personal i Do not send cash or cash equivalent.

**Reusable Express Enve**

**Letter Size**
Reduce paper waste by using this enve return to sender or with another recipi flap above.

 100% Recycled fiber
80% Post-Consumer

International Shipping Notice — Carriage hereun and other terms and/or conditions established b Rules Relating to International Carriage by Air (th on the Contract for the International Carriage of commodities, technology or software were expo Administration Regulations. Diversion contrary t



BILLING: 3RD PARTY

XOL 22-90.19      NV45 44.0A 19.2025*

**UPS 2ND DAY AIR**

TRACKING #: 1Z 84R V87 02 3654 7080

**CA 921 9-10**

2

RECEIVED

SHIP TO:
**UNITED STATES DISTRICT COURT CLERK**
SOUTHERN DISTRICT OF CALIFORNIA
333 W BROADWAY STE 420
**SAN DIEGO CA 92101-3806**

CHRISTOPHER HERNANDEZ REG-695
555555555
USP LOMPOC
PO BOX 2000
BRUCETON MILLS WV 26525

0.1 LBS LTR

1 OF 1

FOR UPS SHIPPING ONLY





SOUTHERN DISTRICT OF CALIFORNIA
333 W BROADWAY
STE 420
SAN DIEGO CA 92101

P:BLACK'S.2    1:2

**0807-6720**×

1Z84RV8702365J 7080
US 920Z HIPPS 26.3 Z SATCLR
SATI08486 XLE 89-1 Nov 6 07:27:26 2025

